UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: September 24, 2018

------------------------------------------------X
                             :

In re: MEL COOPER,                   :       17 Civ. 6848 (KPF)
                             :

             Debtor.      :    Bankr. No. 14-10221 (SCC)
                             :

------------------------------------------------:
                             :       17 Civ. 6849 (KPF)

In re: IMPERIAL CAPITAL,     :
                             :    Bankr. No. 14-10236 (SCC)

             Debtor.      :
                             :      **OPINION AND ORDER**
------------------------------------------------X

KATHERINE POLK FAILLA, District Judge:

     Appellant BB Holding Group, LLC ("BBHG") appeals from an August 17, 2017 Order entered by United States Bankruptcy Judge Shelley C. Chapman that approved a global settlement agreement (the "Settlement Agreement") in two related bankruptcy proceedings: a Chapter 11 petition signed by Melvin ("Mel") Cooper and filed on behalf of Imperial Capital LLC ("Imperial"), and a Chapter 7 petition filed by Cooper individually.[1] Animating these tandem appeals is BBHG's claim that certain property transferred by the respective bankruptcy trustees pursuant to the Settlement Agreement — in particular, the causes of action in a New York state-court action captioned *BB Holding Group, LLC* v. *QT Talk, et al.*, Index No. 652618/2014 (N.Y. Sup. Ct., New York County) (the "BBHG Action") — did not constitute property of Cooper's

---

[1]     Several of the parties involved in these proceedings have the surname Cooper. References to "Cooper" with no first name pertain to Mel Cooper.

bankruptcy estate (the "Cooper Estate"). Appellant claims that it, and not the Cooper Estate, owns the disputed causes of action.

Broadly speaking, Appellant urges this Court to reverse the Bankruptcy Court's Order approving the Settlement Agreement. It claims that the Bankruptcy Court erred in (i) approving the Settlement Agreement despite evidence that certain transferred property in fact belonged to BBHG; (ii) failing to apply the doctrine of incorporation by estoppel to recognize BB LLC as a legal entity, which Appellant argues would have supported a finding that the disputed causes of action belonged to BBHG; (iii) permitting the disputed causes of action to be transferred free and clear of attorneys' charging liens; and (iv) failing to approve BBHG's request for additional discovery on the question of ownership of the shares in QT, and on the related claims asserted in the BBHG Action.

The Court addresses each of Appellant's arguments in turn. Before that, however, the Court must address an antecedent question, raised by Appellees, as to whether Appellant's claims are statutorily moot under section 363(m) of the Bankruptcy Code. *See* 11 U.S.C. § 363(m). For the reasons that follow, the Court finds that Appellant's claims are not moot, but that they fail on the merits. The Court therefore affirms the Bankruptcy Court's Order approving the Settlement Agreement, and denies both appeals.

## A. Factual Background

### 1. The Mel Cooper Bankruptcy Petitions

Mel Cooper is no stranger to the U.S. Bankruptcy Court for the Southern District of New York. Since 2011, Cooper has filed four petitions of which this Court is aware. On July 1, 2011, he filed a Chapter 13 petition that was captioned *In re Mel Cooper*, No. 11-13190 (SHL). (6848 App'x 3). The Bankruptcy Court dismissed that petition a few months later, after Cooper failed to appear at his initial meeting of creditors, failed to file a Statement of Financial Affairs and other requisite documents, and failed to provide the Chapter 13 trustee with necessary paperwork. (*Id.* at 3-4). On June 12, 2012, Cooper filed a second petition, *In re Mel Cooper*, No. 12-12418 (SHL), which the Bankruptcy Court dismissed on September 7, 2012, based on Cooper's failure to appear and/or to file required documents. (*Id.* at 4). Two weeks after that,

---

[2]     The Court's review is limited to the facts presented in the record below. *See In re Ampal-Am. Israel Corp.*, 554 B.R. 604, 617 (S.D.N.Y. 2016) ("[T]he district court may not consider evidence outside the record below."). The facts set forth in this Opinion are drawn from the records provided in BBHG's designations under Federal Rule of Bankruptcy Procedure 8009 (Dkt. #4, *In re Mel Cooper*, No. 17 Civ. 6848 (KPF) (S.D.N.Y. Sept. 8, 2017) (the "6848 Action"); Dkt. #5, *In re Imperial Capital*, No. 17 Civ. 6849 (KPF) (S.D.N.Y. Sept. 8, 2017) (the "6849 Action")), as well as the dockets of the bankruptcy cases, No. 14-10221 (SCC) (Bankr. S.D.N.Y.) and No. 14-10236 (SCC) (Bankr. S.D.N.Y.). Because BBHG submitted the record for each appeal in an Appendix, citations to the record will be referred to using the convention "6849 App'x [page number]" or "6848 App'x [page number]," with the word "Appellees" inserted before "App'x" where the Court cites to the Appellees' appendix. Appellant's brief in support of its appeal in the 6848 Action is substantially identical to that filed in the 6849 Action. Accordingly, the Court refers to Appellant's brief in support of its appeal in the 6848 Action as "Appellant Br." (Dkt. #8), and does not refer to the brief filed in the 6849 Action. Appellees' opposition brief in the 6848 Action is referred to as "Appellees Br." (Dkt. #16). Because Appellees' brief in 6849 Action adopts the arguments made in the opposition brief in the 6848 Action, the Court does not refer to Appellees' brief in the 6849 Action. Appellant's reply brief in the 6848 Action, which is substantially identical to the reply brief filed in the 6849 Action, is referred to as "Appellant Reply" (Dkt. #17).

Cooper filed a third petition, *In re Mel Cooper*, No. 12-13981 (SHL); the Bankruptcy Court dismissed that petition on February 6, 2013, and concurrently prohibited Cooper from filing another petition within one year of the termination of the third petition (the "Bar Order"). (*Id.*).

On January 31, 2014, Cooper commenced the bankruptcy petition that is the subject of the pending appeal in No. 17 Civ. 6848 (KPF). (6848 App'x 5).[3] Cooper originally filed the petition under Chapter 13 of the Bankruptcy Code, but the Bankruptcy Court converted it to a Chapter 7 petition. (*Id.*). On February 24, 2014, the Court appointed Albert Togut as the Chapter 7 Trustee (the "Cooper Trustee") pursuant to 11 U.S.C. § 702(d). (*Id.*).

In connection with his bankruptcy petition, Cooper filed Schedules and a Statement of Financial Affairs on January 31, 2014. (6848 App'x 5-6). In those Schedules, he disclosed interests in Imperial and QT, but did not disclose any interest in BBHG or his deceased father's estate. (*Id.* at 6). After a meeting with creditors pursuant to 11 U.S.C. § 341(a) on April 23, 2014, Cooper filed amended Schedules and an amended Statement of Financial Affairs, which for the first time listed an interest in BBHG. (*Id.* at 6-7).

## 2.    The Imperial Bankruptcy Petition

On January 31, 2014, Imperial filed a petition for relief under Chapter 11 of the Bankruptcy Code. (6848 App'x 8). Mel Cooper signed the petition. (*Id.*). Other shareholders of Imperial challenged Cooper's authority to file the

---

[3]    By filing his petition on January 31, 2014, Mel Cooper violated the February 6, 2013 Bar Order.

4

petition, and on March 4, 2014, they moved to dismiss the matter. (*Id.*). On May 29, 2014, the Bankruptcy Court appointed a Chapter 11 Trustee for Imperial, Salvatore LaMonica (the "Imperial Trustee" and together with the Cooper Trustee, the "Trustees"). (*Id.*). The Bankruptcy Court did not dismiss the petition, and entered Orders tolling the periods within which Imperial could assert claims against David Cooper, Eric Ramos, and Cara Cooper. (*Id.* at 9).[4]

On October 19, 2017, the Imperial Trustee filed a Chapter 11 plan and disclosure statement, which sought to "give effect in all respects to the [Order and Settlement Stipulation]." (*See* No. 14-10236 (SCC), Dkt. #309). Later that day, the Bankruptcy Court conditionally approved the Imperial Trustee's disclosure statement and scheduled a hearing to consider final approval of the disclosure statement and the Imperial Trustee's plan. (6848 Appellees App'x 5). Though Mel Cooper and his counsel were timely served with notice of the hearing, neither Mel Cooper nor BBHG objected to the Imperial Trustee's plan or disclosure statement. (*Id.* at 1-4).

### 3. The State-Court Lawsuits

#### a. The Cooper Action

Mel Cooper filed several lawsuits in New York State Supreme Court relevant to the pending appeals. On December 23, 2013, Mel Cooper brought suit, in his individual capacity and as a member of the limited liability companies QT Talk LLC ("QT") and Medcom Communications LLC ("Medcom"),

---

[4]    As it happened, the relevant Operating Agreement recited Imperial's members and their respective financial interests to be: Mel Cooper (50.5%), David Cooper (28.84%), Eric Ramos (20.41%), and Cara Cooper (0.25%). (6848 App'x 9).

against QT, Medcom, David Cooper, Cara Cooper, and Eric Ramos. *See Melvin Cooper* v. *QT Talk, et al.*, Index No. 653529/2013 (N.Y. Sup. Ct., New York County) (the "Cooper Action" and together with the BBHG Action, the "Actions"). (6848 App'x 48). Cooper alleged that he and his son, David Cooper, had formed Medcom in April 2006. (*Id.* at 52). Cooper, David Cooper, Eric Ramos, and Louis Ariolla were original members of Medcom, each with a 25% ownership stake. (*Id.*). In late 2006 or early 2007, David Cooper and Eric Ramos terminated Louis Ariolla's employment with Medcom. (*Id.* at 53). Thereafter, Cooper, David Cooper, and Eric Ramos created a second company, QT, with each man holding a 33.3% share of the company. (*Id.*).

Mel Cooper alleged that, in April 2011, David Cooper and Eric Ramos ceased paying his salary, shortly after they had executed a large contract with a new customer. (6848 App'x 54-55). He claimed that David Cooper, Cara Cooper, and Eric Ramos then "transferred and converted all of Medcom's assets to QT [ ], or to other companies that are under the[ir] dominion and control" and "refuse[d] to permit [him], an equal member of [QT and Medcom], access to any of the Companies' books and records[.]" (*Id.* at 49). Indeed, Cooper asserted that David Cooper, Cara Cooper, and Eric Ramos "schemed to remove [him] as an officer and director of the Companies, deprived [him] of his due salary, froze [him] out of all financial and business affairs of the Companies, paid themselves exorbitant salaries, collected dividends and profits to [his] detriment, and without any consideration transferred all of the assets of Medcom to QT[.]" (*Id.*). He brought claims for fraud, fraud in the inducement,

conversion, waste and mismanagement, unjust enrichment, breach of contract, breach of fiduciary duty, and breach of the covenant of good faith and fair dealing. (*Id.* at 60-72). He sought damages "believed to be in excess of twenty million dollars" and punitive damages "believed to be in excess of fifty million dollars[.]" (*Id.* at 72).

After his appointment, the Cooper Trustee demanded that Mel Cooper stay the Cooper Action until the Cooper Trustee had had an opportunity to assess whether it constituted part of the Cooper Estate. (6848 App'x 10). He further demanded that Cooper produce all documents and information concerning the Cooper Action. (*Id.*). Mel Cooper refused to comply with either demand, prompting the Cooper Trustee to remove the Cooper Action to federal court. (*Id.* at 11).

### b. The BBHG Action

On August 21, 2014, after the Cooper Action had been removed to federal court, Mel Cooper filed a second action in New York state court — this time on behalf of BBHG — against many of the same defendants, including QT, David Cooper, Cara Cooper, and Eric Ramos. (6848 App'x 86). What is more, the allegations in the BBHG Action were substantially similar to those in the Cooper Action, except that, as relevant here, Cooper alleged that he did *not* hold any direct interest in QT, but instead owned an interest in QT only through his minority interest in BBHG. (*Id.* at 86-88). In the BBHG Action, Cooper alleged that David Cooper, Cara Cooper, and Eric Ramos "depriv[ed] [BBHG] of its membership interest and rights in collecting dividends and

profits from QT [ ], and transferr[ed] assets from QT [ ] to other companies in which the individual defendants have ownership interests[.]" (*Id.* at 86-87). He further alleged that David Cooper, Cara Cooper, and Eric Ramos "refused to permit [BBHG's] managing member (Melvin Cooper), access to any of [the] books and records of QT [ ], including, but not limited to, financial statements, tax returns, reports, the operating agreement, amendments, or restatements." (*Id.* at 87).

The complaint filed in the BBHG Action recited that BBHG "is comprised of two members, nonparties Gabriella Alexandra Cooper, who holds a 75% membership interest, and Melvin Cooper, who holds a 25% membership interest[, and that] Melvin Cooper is the sole manager of [BBHG] and has been since its formation." (6848 App'x 88). As in the Cooper Action, the BBHG Action advanced claims for fraud, breach of contract, breach of the covenant of good faith and fair dealing, breach of fiduciary duty, waste and mismanagement, conversion, and unjust enrichment, and sought $20 million in monetary damages and $50 million in punitive damages. (*Id.* at 100-06, 112).[5]

On October 10, 2014, the Cooper Trustee made a written demand that Mel Cooper stay the BBHG Action and produce documents and information to enable the Cooper Trustee to determine whether the causes of action asserted in the BBHG Action constituted part of the Cooper Estate. (6848 App'x 12).

---

[5]      The BBHG Action, unlike the Cooper Action, included conspiracy and aiding and abetting claims against Cara Cooper. (6848 App'x 107).

When Mel Cooper refused, the Cooper Trustee filed a letter advising the presiding judge, Justice Jeffrey Oing (the "State Court"), that the BBHG Action was stayed, pursuant to 11 U.S.C. § 362(a), and that it could only be prosecuted with the Trustee's written consent. (*Id.*). On March 31, 2015, BBHG filed an application for relief from the automatic stay in the BBHG Action. (*Id.* at 12-13). In support of BBHG's application, Mel Cooper filed an affidavit stating that "BBHG … was the actual owner/member of the units of QT [ ] … that I mistakenly stated were owned by me personally in a prior state court action that I brought against QT [ ], Eric Ramos, David Cooper[,] and Cara Cooper[.]" (*Id.* at 13).

The Cooper Trustee and BBHG entered into a stipulation, dated April 28, 2015, in which they agreed that BBHG could proceed with the BBHG Action, but that neither the Cooper Trustee nor the Cooper Estate would have any obligation to pay BBHG's counsel, Mitchell Shapiro, in connection with the BBHG Action. (6848 App'x 464). The stipulation further established that neither BBHG nor its counsel or officers could dispose of the BBHG Action without the Cooper Trustee's written consent, nor could BBHG distribute any proceeds from the Cooper Action without an order from the Bankruptcy Court. (*Id.* at 465). On April 28, 2015, the Bankruptcy Court entered an Order approving the parties' stipulation. (*Id.* at 467).

### 4.     The Settlement Agreement

On June 16, 2017, the Cooper Trustee and the Imperial Trustee jointly moved for approval of a global settlement agreement.  (6848 App'x 27).  The primary terms of the Settlement Agreement were as follows:

(i)     David Cooper, Cara Cooper, Eric Ramos, and D&E Real Estate would receive a distribution of $80,000 from the Imperial Estate and waive all other recovery from the Cooper and Imperial Estates;

(ii)    The Imperial Trustee would waive any claims against or recovery from the Cooper Estate;

(iii)   The Cooper Estate would receive a distribution from the Imperial Estate equal to the greater of $300,000 or the remaining balance in the Imperial Estate after payment of $80,000 to the other parties and any allowed expenses; and

(iv)   The causes of action in the Cooper Action and the BBHG Action would be sold, assigned, and conveyed to Cara Cooper, David Cooper, and Eric Ramos (the "Transferees").

(*Id.* at 16-17).  It is the last provision — the transfer of the causes of action in the BBHG Action — that lies at the heart of this appeal; BBHG argues that the Action was property of BBHG, not Mel Cooper, and therefore could not have formed part of the assets transferred pursuant to the Settlement Agreement.

10

**B.    Procedural Background**

**1.    The Bankruptcy Court's Decision**

On August 17, 2017, Bankruptcy Judge Chapman issued an Order granting the Trustees' joint motion for approval of the Settlement Agreement. (6848 App'x 585).  She did so after considering the objection filed by BBHG, and the replies thereto from the Cooper and Imperial Trustees.  (*Id.* at 573-74). The Bankruptcy Court found that "[t]he Settlement Agreement is the product of arm's length negotiations among the [p]arties," "falls within the range of reasonableness," is "in the best interests of creditors of both [Imperial and Cooper]," and is "supported by all [p]arties as well as their experienced and knowledgeable counsel after lengthy negotiations." (*Id.* at 575).  The Bankruptcy Court further found that "[t]he releases granted in the Settlement Agreement are reasonable and supported by adequate consideration." (*Id.*).

The Bankruptcy Court expressly held that "all claims and causes of action that were or that could have been asserted by Mel Cooper in the [Cooper] Action and in the BBHG Action … are property of the [ ] Cooper Estate … and the Cooper Trustee has all requisite authority to sell, assign[,] and release the [claims] to David Cooper, Eric Ramos, and Cara Cooper[.]" (6848 App'x 576).  It found that the Trustees' decisions to assign the claims in the BBHG Action "constitute[d] the valid exercise of the respective Trustees' business judgment and are in the best interests of the [bankruptcy estates], their respective creditors[,] and other parties in interest." (*Id.* at 577).

With specific respect to the assignment of the BBHG Action, the Bankruptcy Court noted: "The Cooper Claims Transferees are acquiring the Cooper Claims in good faith under section 363(m) of the Bankruptcy Code and, as such, are entitled to all of the protections afforded thereby." (6848 App'x 577). It further concluded that "[t]he consideration provided by the Cooper Claims Transferees for the Cooper Claims … constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code[.]" (*Id.* at 582).

The Bankruptcy Court ordered that "[n]either the Cooper Claims Transferees nor any affiliate thereof shall have any obligations with respect to any liability of the … Cooper Estate or the Cooper Trustee with respect to any Liens, Claims and Interests against or arising from any of the Cooper Claims." (6848 App'x 578). David Cooper, Cara Cooper, and Eric Ramos were to receive title to the causes of action "free and clear of all [and] any liens, claims, interests and encumbrances[.]" (*Id.* at 580). And all persons holding liens in the BBHG Action were "forever barred, estopped, and permanently enjoined" from asserting those liens. (*Id.* at 582).

## 2. The Instant Appeal

On September 8, 2017, BBHG filed a Notice of Appeal from the Bankruptcy Court's August 17, 2017 Order approving the global settlement agreement in the 6848 and 6849 Actions. (6848 Dkt. #1; 6849 Dkt. #1). BBHG filed its opening brief in the 6848 and 6849 Actions on November 2, 2017. (6848 Dkt. #9; 6849 Dkt. #9). The Cooper Trustee filed his opposition

brief on December 11, 2017; that same day, the Imperial Trustee filed a short brief adopting the Cooper Trustee's arguments. (6848 Dkt. #16; 6849 Dkt. #12). BBHG filed its reply brief on December 26, 2017. (6848 Dkt. #17; 6849 Dkt. #14).

## DISCUSSION

### A. Applicable Law

#### 1. Appellate Jurisdiction

District courts are vested with appellate jurisdiction over bankruptcy court rulings. *See* 28 U.S.C. § 158(a). More specifically, district courts may exercise jurisdiction "to hear appeals ... from final judgments, orders, and decrees ... of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of [Title 28]." *Id.* Orders are final where "[n]othing in the order ... indicates any anticipation that the decision will be reconsidered," *In re Palm Coast, Matanza Shores Ltd. P'ship*, 101 F.3d 253, 256 (2d Cir. 1996); orders "may be immediately appealed if they finally dispose of discrete disputes within the larger case," *id.* (quoting *In re Johns-Manville Corp.*, 920 F.2d 121, 126 (2d Cir. 1990)). Here, it is undisputed that the Bankruptcy Court's Order approving the parties' settlement agreement constituted a final, appealable order.

#### 2. The Standard of Review for Bankruptcy Court Decisions

A district court may "affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings." *In re Bernard L. Madoff Inv. Secs., LLC*, No. 15 Civ. 1151 (PAE),

2016 WL 183492, at *8 (S.D.N.Y. Jan. 14, 2016) (internal quotation marks and citation omitted). The Bankruptcy Court's factual findings are reviewed for clear error, whereas its legal conclusions are reviewed *de novo*. *In re Margulies*, 566 B.R. 318, 328 (S.D.N.Y. 2017) (citing *In re Bayshore Wire Prods. Corp.*, 209 F.3d 100, 103 (2d Cir. 2000)). "A finding is 'clearly erroneous' when the reviewing court is 'left with the definite and firm conviction that a mistake has been made.'" *Id.* (citation omitted).

## B.   Analysis

### 1.   The Pending Appeal Is Not Statutorily Moot Under Section 363(m) of the Bankruptcy Code

Preliminarily, the Court assesses whether the instant appeal is rendered moot by section 363(m) of the Bankruptcy Code, which states, in relevant part:

> [t]he reversal or modification on appeal of an authorization … of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). "[R]egardless of the merit of an appellant's challenge to a sale order, [a reviewing court] may neither reverse nor modify the judicially-authorized sale if the entity that purchased or leased the property did so in good faith and if no stay was granted." *Licensing by Paolo, Inc.* v. *Sinatra (In re Gucci)*, 105 F.3d 837, 840 (2d Cir. 1997) ("*Gucci I*"). Where applicable, section 363(m) "limits appellate jurisdiction over an unstayed sale order issued by a bankruptcy court to the narrow issue of whether the property was sold to

a good faith purchaser." *In re Motors Liquidation Co.*, 428 B.R. 43, 53 (S.D.N.Y. 2010) (citing 11 U.S.C. § 363(m); *Contratian Funds LLC* v. *Aretex LLC (In re WestPoint Stevens, Inc.)*, 600 F.3d 231, 247-48 (2d Cir. 2010); *Gucci I*, 105 F.3d at 839).

Here, there is no dispute that the Bankruptcy Court rejected BBHG's request to stay the Order approving the settlement agreement.  In rejecting BBHG's application for a stay pending appeal, the Bankruptcy Court explained:

> [t]here is no public interest that would be served by imposing a stay to enable a frivolous litigation course of conduct to continue that has caused unnecessary expense and delay at every turn.  There has yet to be one instance in either of these cases in which there has been full cooperation and full truthfulness and I believe that the system has been abused this time and previously by Mr. Cooper. … The public interest here is that this case be brought to a speedy conclusion and that the bankruptcy process be respected.

(6848 App'x 568).  Similarly, there is no dispute that causes of action — like those asserted in the BBHG Action — may constitute "property" in the context of bankruptcy proceedings.  *See Chartschlaa* v. *Nationwide Mut. Ins. Co.*, 538 F.3d 116, 122 (2d Cir. 2008).  Instead, the parties' disputes revolve around two questions: *first*, whether the Settlement Agreement involved a "sale or lease" of the BBHG Action; and if so, *second*, whether the Action was purchased in "good faith."

### a. The Transfer of the BBHG Action Constituted a "Sale" for Purposes of Section 363(m) of the Bankruptcy Code

The Court first assesses whether the transfer of the BBHG Action constituted a "sale" for statutory purposes, an issue that Appellees fail to

address directly.  To be sure, Appellees note that "[t]he Settlement Stipulation has already been consummated in the absence of a stay pending appeal" (Appellees Br. 21); that the BBHG causes of action "were immediately conveyed to the … [t]ransferees" and the State Court has already "entered an order discontinuing the BBHG Action without prejudice" (*id.* at 22); and that "[t]he Imperial Trustee has already made its distributions to the Cooper Trustee pursuant to the Imperial Trustee's plan" (*id.*).  They also assert that modification of the Bankruptcy Court's Order would "'affect the validity' and the very heart of the Settlement Stipulation in violation of section 363(m) of the Bankruptcy Code."  (*Id.* at 22-23).

    Yet Appellees do not squarely address whether the transfer of a cause of action constitutes a "sale" of property for statutory purposes.  As Appellant rightly notes, "Appellee[s] provide no citation for the proposition that a transfer is the same as a sale (an arms[-]length transaction for value) under section 363(m)."  (Appellant Reply 3).  They do not reference any relevant case law or engage in any analysis to persuade this Court that a transfer or assignment of claims, executed as part of a settlement agreement, constitutes a "sale" under section 363(m).

    Appellant's arguments in this regard, however, recall the proverb about glass houses:  After chastising Appellees for failing to cite relevant case law, Appellant commits the very same error.  It neither cites relevant cases, nor engages in any analysis as to what constitutes a "sale" under section 363(m).  Instead, it states in conclusory fashion that "there was no sale or lease of

property," and that the "causes of action [instead] were transferred to [Eric Ramos, David Cooper, and Cara Cooper]." (Appellant Reply 3).

The Court therefore takes up the question largely unassisted by the parties' briefing. In assessing whether the transfer at issue constituted a "sale" of property, the Court begins with the language in the Settlement Agreement and the Bankruptcy Court's Order. The Settlement Agreement states that the Bankruptcy Court was to "authorize the Cooper Trustee's *sale*, assignment[,] and conveyance of all claims and causes of action that were or could have been asserted in … the [Cooper] Action and in the BBHG Action … to [the Transferees] … free and cl[ear] of all liens, claims, interests[,] and encumbrances[.]" (6848 App'x 599-600 (emphasis added)). The Bankruptcy Court's Order, in turn, stated that the causes of action were to be transferred "in accordance with the Settlement Agreement, on an 'As Is, Whereis' basis without any representations or warranties[.]" (*Id.* at 580). The transfer was "legal, valid, and effective" (*id.* at 581); it vested the Transferees "with all right, title, and interest of the [ ] Cooper Estate in and to the [BBHG Action]" (*id.*); and "[t]he consideration provided … for the Cooper Claims … constitute[d] reasonably equivalent value and fair consideration" (*id.* at 582). The parties used the term "sale" in reference to the assignment of the disputed causes of action, and the Bankruptcy Court adopted the parties' agreement and found that the transfer was valid and supported by adequate consideration. The Court finds the language in the Settlement Agreement to be probative of the

parties' understanding that the assignment of the disputed claims constituted a "sale" for purposes of section 363(m).

The Court next turns to the Bankruptcy Code, which itself supports the conclusion that a transfer constitutes a "sale" for purposes of section 363(m). In particular, the Court notes that, in section 101, the Bankruptcy Code defines "purchaser" as a "*transferee* of a voluntary *transfer*." 11 U.S.C. § 101(43) (emphases added). By equating a "purchaser" to a "transferee," the Bankruptcy Code all but disposes of the question at hand. If a "purchaser" is defined as the party on the receiving end of a voluntary transfer, the "seller" must be the party on the other end of the transfer. Under the Bankruptcy Code, then, the transaction between a purchaser and a seller is conceived of as a "voluntary transfer." That is precisely what occurred here. The Trustees voluntarily, and in exchange for adequate consideration, transferred the disputed causes of action to David Cooper, Cara Cooper, and Eric Ramos. The Court notes that this conception of "sale" aligns with the term's common dictionary definition. Black's Law Dictionary defines "sale" as "[t]he *transfer* of property or title for a price." *Sale*, BLACK'S LAW DICTIONARY (10th ed. 2014) (emphasis added). Merriam-Webster defines "sale" as "the *transfer* of ownership of and title to property from one person to another for a price." *Sale*, MERRIAM-WEBSTER DICTIONARY (11th ed. 2011) (emphasis added). The Court concludes that, for purposes of section 363(m), the transfer of the causes of action constituted a "sale" of property.

That the transfer did not result from a public sale does not require this Court to hold otherwise. Whether the transfer is effectuated pursuant to a settlement agreement, a public auction, or a private sale is largely immaterial to the section 363(m) analysis. *See, e.g.*, *In re Berkeley Del. Court, LLC*, 834 F.3d 1036, 1040 (9th Cir. 2016) (noting that where "a bankruptcy court invokes [section] 363 for a sale of claims pursuant to a settlement agreement, all parties are bound by [section] 363(m)'s requirement to seek a stay regardless of whether an outside party makes a bid on the sale"); *In re Wieboldt Stores, Inc.*, 92 B.R. 309, 313 (N.D. Ill. 1988) (observing that "[t]he fact that the transfer did not result from competitive bidding is [ ] not dispositive" in determining whether a transaction constitutes a "sale" under section 363 of the Bankruptcy Code); *In re Pisces Leasing Corp.*, 66 B.R. 671, 673 (E.D.N.Y. 1986) (characterizing the transfer of property pursuant to a settlement agreement as a "sale").

This Court sees no meaningful distinction between a sale, on the one hand, and a transfer of property in exchange for valid consideration, on the other. To find otherwise would be to elevate form over substance. It would also threaten to undermine the policy that section 363(m) serves: to encourage "finality in bankruptcy sales" and to "assist[ ] the bankruptcy court to secure the best price for the debtor's assets." *Gucci I*, 105 F.3d at 840 (citing *United States* v. *Salerno*, 943 F.2d 117, 123 (2d Cir. 1991)). For these reasons, the Court finds that the transfer of the BBHG causes of action to the Transferees constitutes a "sale" for purposes of section 363(m).

### b.    The Transferees Are Not "Good Faith" Purchasers

The only question, then, is whether the Transferees were "good faith" purchasers. Though the Bankruptcy Code does not define "good faith purchaser," the Second Circuit has "adopted the traditional equitable definition: 'one who purchases the assets for value, in good faith and without notice of adverse claims.'" *In re Lehman Bros. Holdings, Inc.*, 415 B.R. 77, 83-84 (S.D.N.Y. 2009) (quoting *Licensing by Paolo, Inc.* v. *Sinatra (In re Gucci)*, 126 F.3d 380, 390 (2d Cir. 1997) ("*Gucci II*")). In assessing whether a purchaser acted in good faith, courts look to "the integrity of his conduct during the course of the sale proceedings; where there is a lack of such integrity, a good faith finding may not be made." *Gucci II*, 126 F.3d at 390. "[F]raud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders" suggests a lack of good faith. *Id.* (quoting *In re Rock Indus. Machinery Corp.*, 572 F.2d 1195, 1198 (2d Cir. 1978)).

"The 'good-faith purchaser' determination 'is a mixed question of law and fact.'" *In re Lehman Bros. Holdings, Inc.*, 415 B.R. at 84 (quoting *Gucci II*, 126 F.3d at 390). For the question of law — whether the Bankruptcy Court applied the correct legal standard in conducting the "good faith" analysis — this Court conducts a *de novo* review. *In re Bayshore Wire Prods. Corp.*, 209 F.3d at 103. For the question of fact — whether the Transferees were "good faith" purchasers — the Court reviews the Bankruptcy Court's decision under a clear error standard. *In re Margulies*, 566 B.R. at 328.

Neither party suggests that the Bankruptcy Court adopted the wrong legal standard. Instead, Appellant only disputes that the Transferees were "good faith" purchasers, arguing that (i) "there was no sale proceeding," such that the Transferees necessarily could not be considered good faith purchasers; (ii) the Transferees had "frustrated Appellant['s] ability to conduct discovery in the state court action by refusing to comply with demands or appear for … deposition[s]" and therefore could not be considered to have acted in good faith; and (iii) the transfer of the BBHG Action could be unwound without disturbing the Settlement Agreement. (Appellant Reply 4-5). In Appellant's estimation, the causes of action could simply be transferred back to the Cooper Estate, and because "the [BBHG Action] was dismissed without prejudice," it "can be re-initiated." (*Id.* at 5). That is particularly true, in Appellant's view, because "Appellee[s] present[ ] no evidence that the remainder of the Settlement Stipulation would need to be disturbed if Appellant succeeds in this appeal." (*Id.* at 5-6).

The Court is unpersuaded by Appellant's arguments. It begins by agreeing with the Bankruptcy Court that there was a "robust record[ ]" suggesting that "the settlements and compromise [ ] set forth in the stipulation were thought long and hard over the last two years[.]" (6848 App'x 559). Based on the evidence before it, the Bankruptcy Court reasonably found that the settlement agreement was "the product of arm's length bargaining both within each of the estates between the trustee on the one hand and creditors on the other hand and between the two estates balancing the … competing

interest[s] of the various estates." (*Id.* at 561). The Bankruptcy Court further noted that the record "could not be stronger" in suggesting "that the conduct of each of these trustees … represents a valid exercise of their business judgment." (*Id.* at 567). In consequence, the Bankruptcy Court's Order expressly states that "[t]he Settlement Agreement is the product of arm's length negotiations among the [p]arties and was negotiated, proposed[,] and entered into by the [p]arties without collusion and in good faith." (*Id.* at 575).

There is no evidence of fraud, collusion, or bad faith by the purchasers. And this Court has already explained that the transfer of assets, effectuated through the Settlement Agreement, constituted a "sale" process for purposes of section 363(m). The Court therefore rejects Appellant's argument that the Transferees could not be "good faith" purchasers because there was no sale. Nor is the Court persuaded by the Appellant's suggestion that the Transferees cannot be considered good faith purchasers because they had frustrated Appellant's efforts to engage in discovery. Such an argument fails on multiple levels: Most immediately, Appellant is referring not to the Transferees' conduct during the sale proceedings, but instead to their conduct in state-court litigation; the latter is, of course, not germane to the good faith analysis. But even if the Transferees' conduct in the underlying litigation were relevant, the record simply does not support Appellant's suggestion of misconduct. Instead, the record suggests that the Transferees engaged in discovery in the state-court litigation, and declined to appear for depositions only because of BBHG's own

scheduling conflict and a stipulated stay of the BBHG Action. (6849 App'x 524-25).

In his Declaration, David Cooper states that "discovery ha[d] proceeded in the ordinary course without any judicial intervention" and all discovery orders were "entered during routine scheduling conferences." (6849 App'x 524). The Transferees "had been cooperating fully and in compliance with the Court Rules, including by serving responses to interrogatories, responses to document demands, and by producing over 800 pages of documents prior to the date on which the parties jointly agreed to stay the [BBHG] Action pending resolution of th[e bankruptcy]." (*Id.* at 524-25). And to the extent the Transferees failed to sit for depositions in the BBHG Action, the record suggests that they did so because of a stay in that Action. Indeed, "BBHG first noticed defendants' depositions for June 26, 2017. On June 20, 2017, given the filing of the Trustees' Joint Motion Approving Settlement and Transfer of Claims, defendants in the [BBHG] Action filed an Order to Show Cause to stay the [BBHG] Action[.]" (*Id.* at 525). That the BBHG Action was likely to be stayed pending the settlement of the bankruptcy action belies Appellant's claim that the Transferees' failure to sit for depositions in the BBHG Action constitutes evidence of bad faith.

Finally, the Court rejects, as irrelevant and unpersuasive, Appellant's argument that the Settlement Agreement would be undisturbed if this Court were to undo the transfer of the BBHG Action. The Court fails to see the relevance, for purposes of the good faith inquiry, of the Settlement Agreement's

ability to withstand an unwinding of the challenged transfer. Yet even if that were somehow relevant, the Court finds it unlikely that the Settlement Agreement would survive if the transfer of the BBHG Action were undone. A review of the Settlement Agreement — and in particular the fact that the Transferees were willing to accept just $80,000 in compensation, compared to the $300,000 (at a minimum) allocated to the Cooper Estate — suggests that the disputed transfer was not peripheral. Similarly, the fact that 4 out of 13 pages in the Bankruptcy Court's Order approving the Settlement Agreement dealt exclusively with the transfer of the disputed causes of action further evidences their importance to the agreement. The record strongly suggests that those causes of action were central to the settlement discussions, and that the transfer of the BBHG Action could not be undone without threatening the viability of the Settlement Agreement.

Even so, the Court cannot find that the Transferees were good faith purchasers. Although neither side has raised this issue, the Court must consider whether the Transferees' knowledge of BBHG's adverse claims precludes a finding that the Transferees were "good faith" purchasers under section 363(m). Indeed, the Second Circuit has explained that a good faith purchaser is "one who purchases the assets for value, in good faith, *and without notice of adverse claims.*" *Gucci II*, 126 F.3d at 390 (quoting *Willemain* v. *Kivitz*, 764 F.2d 1019, 1023 (4th Cir. 1985) (emphasis added)).

There is, of course, some tension between promoting finality of bankruptcy sales, on the one hand, and requiring that good faith purchasers

lack any knowledge of adverse claims, on the other.  Bankruptcy proceedings frequently feature objectors.  If mere knowledge of an objection to a bankruptcy sale (or settlement, as the case may be) were to preclude application of section 363(m), the provision's reach would be dramatically circumscribed.  So too would its ability to "further[ ] the policy of finality in bankruptcy sales and assist[ ] the bankruptcy court to secure the best price for the debtor's assets." *In re Motors Liquidation Co.*, 428 B.R. at 53-54 (quoting *In re WestPoint Stevens, Inc.*, 600 F.3d at 248-49; *Salerno*, 932 F.2d at 123).

Courts have therefore required more than mere knowledge of adverse claims to find bad faith.  Courts generally distinguish between purchasers who have knowledge that objections have been filed, and those that have more intimate knowledge of the facts giving rise to adverse claims.  *See, e.g.*, *In re TMT Procurement Corp.*, 764 F.3d 512, 522 (5th Cir. 2014) ("There is a difference, as demonstrated by this case, between simply having knowledge that there are objections to the transaction and having knowledge of an adverse claim.").  This Court is unaware of any case that articulates a specific rule for distinguishing between "mere knowledge" of objections and "knowledge of adverse claims" sufficient to preclude a finding of good faith.

But a review of relevant cases suggests that the critical factor is the extent of the purchaser's knowledge regarding the adverse claims.  For example, in *Jeremiah* v. *Richardson*, the First Circuit found that a purchaser could not be considered a good faith purchaser because it "had notice and knowledge of the very same claim which lies at the heart of the disputed

compromise before us."  148 F.3d 17, 23 (1st Cir. 1998).  There, much like here, the purported "good faith" purchaser was in fact a party to the litigation giving rise to the adverse claims.  *Id.*  Similarly, in *In re TMT Procurement Corp.*, the Fifth Circuit found that a party that was on notice of adverse claims that another entity had repeatedly asserted before the bankruptcy and district courts could not be considered a good faith purchaser.  764 F.3d at 522.

By contrast, where purchasers merely have knowledge of the existence of objections, courts tend to treat that knowledge as insufficient to prevent a finding of good faith.  *See, e.g.*, *In re Old Cold LLC*, 879 F.3d 376, 386-87 (1st Cir. 2018) (neither knowledge of "a likely appellate challenge … nor … knowledge of an objection to the sale procedures constitute[s] knowledge of an adverse claim"); *Willemain*, 764 F.2d at 1024; *Greylock Glen Corp.* v. *Cmty. Sav. Bank*, 656 F.2d 1, 4 (1st Cir. 1981); *In re Dutch Inn of Orlando, Ltd.*, 614 F.2d 504, 506 (5th Cir. 1980); *In re Vanguard Oil & Serv. Co., Inc.*, 88 B.R. 576, 580 (E.D.N.Y. 1988); *In re Lake Placid Co.*, 78 B.R. 131, 135 (W.D. Va. 1987).

Here, the Court easily finds that the Transferees — who are named defendants in the BBHG Action — may not be considered good faith purchasers on account of their detailed, long-standing knowledge of BBHG's adverse claims of which they themselves are subjects.  The Transferees were served with the Complaint in the BBHG Action, participated in discovery in that Action, and had doubtlessly analyzed the merits of the disputed causes of action.  On this record, the Court cannot conclude that the Transferees were good faith purchasers.  Accordingly, the Court finds that this appeal is not

statutorily moot under section 363(m), and turns to the merits of Appellant's claims.

### 2. The Bankruptcy Court Did Not Err in Finding That the BBHG Action Constituted Property of the Cooper Estate

The first substantive issue is whether the Bankruptcy Court erred in finding that the BBHG Action constituted part of the Cooper Estate. Appellant argues that "documentary evidence shows that the [BBHG Action] belong[s] to BBHG." (Appellant Br. 19-20). In support of this argument, it cites: (i) a written declaration by Mel Cooper in which he states that he "*believe[s]* that [he] executed an assignment document from BB LLC to BBHG of BB LLC's 25% interest in QT" (6848 App'x 414 (emphasis added)); (ii) an affidavit by Jerome Goldman, Mel Cooper's attorney during the relevant time period, stating that "[b]ased on the best of [his] recollection and a review of various records ..., [he] ... either prepared [ ] or reviewed various documents relating to Mel Cooper ... at the time that they were created," that "Mel Cooper never intended to hold any of the membership interests or ownership of the QT Talk entities in his own name," and that "Mel Cooper ... assigned and/or transferred all property held by BB LLC — including all of its membership interests and/or shares of the QT Talk entities — to BB Holding Group LLC" (*id.* at 428-29); (iii) a copy of the Shareholders Agreement for QT Networks, Inc., dated August 1, 2006, executed by Mel Cooper on behalf of an entity called "BB LLC" or "BB LLC, LLC" (*id.* at 287, 301); and (iv) a Settlement and Release Agreement, dated January 11, 2011, between QT and its shareholders, which Mel Cooper executed on behalf of "BB Holding LLC" (*id.* at 421, 424).

This Court has thoroughly reviewed the record and disagrees with Appellant's assessment of the evidence. The record strongly suggests that Mel Cooper, not BB LLC or BBHG, owned the QT shares. To begin with, it appears that BB LLC was never incorporated. (*See* 6848 App'x 276; *see also id.* at 553 ("If there is a piece of paper filed as a public record that reflects the existence of BB, LLC you would have it. You have already told me you do not."); *id.* at 548 ("[BB LLC] doesn't exist")). Appellant has been unable to produce any documents evidencing BB LLC's existence, some of which, including the articles of incorporation and operating agreement, would almost certainly have been publicly filed. Appellant was similarly unable to produce the assignment agreement through which BB LLC purportedly transferred QT shares to BBHG. The sole evidence that Appellant provides of any transfer of shares are statements by Mel Cooper and his former attorney, Jerome Goldman. Those statements are vague at best. Cooper states that he "believe[s] that [he] executed an assignment document ... [i]n or about February 2008"; Goldman does not make any definitive statements, but instead qualifies his statements by explaining that they are, "[b]ased on the best of [his] recollection[.]" (*Id.* at 414, 428-29). These qualified statements, when considered in light of the absence of any records — public or private — that BB LLC ever existed or that it transferred QT shares to BBHG, do not provide an adequate basis for this Court to reverse the Bankruptcy Court's factual findings.

That is particularly so, given that, under New York law, the QT Shareholder Agreement vested ownership of QT shares in Mel Cooper. *See,*

*e.g.*, *Metro Kitchenworks Sales, LLC* v. *Continental Cabinets, LLC*, 820 N.Y.S.2d 79, 80 (2d Dep't 2006) ("[w]hen individuals purporting to act on behalf of a non-existent principal enter into a contract with a third party, … the contract generally remains valid and enforceable as between the third party and the individuals who executed the contract on behalf of the non-existent principal"); *accord Artech Info. Sys.* v. *Tee*, 721 N.Y.S.2d 321, 322 (1st Dep't 2001) ("One who contracts in the name of a nonexistent principal[,] or a principal without legal status or existence, renders himself personally liable on the contract so made." (internal quotation marks, brackets, alterations, and citation omitted)); *Grutman* v. *Katz*, 608 N.Y.S.2d 663, 664 (1st Dep't 1994) ("One who signs an agreement on behalf of a nonexistent principal may himself be held liable on that agreement[.]").

Not only does the record fail to establish the existence of BB LLC, but there is also no evidence that BB LLC — even if it existed — transferred QT shares to BBHG. The Shareholder Agreement, on which Appellant heavily relies, references both BB LLC and Mel Cooper; it never mentions BBHG. (6848 App'x 287-301). If, as the record suggests, BB LLC was never incorporated, the only entity that could have assumed ownership of the QT shares pursuant to the Shareholder Agreement is Mel Cooper. And there is no evidence that Cooper ever assigned his shares to BBHG.

To be sure, the Settlement and Release Agreement, dated January 11, 2011, references BB Holding Group, LLC. (6848 App'x 421). It states, in relevant part, that the agreement was made by and among "QT Globe, Inc. …,

David Cooper …, Eric Ramos …, BB Holding Group, LLC ('BB LLC') and Mel Cooper (collectively with BB LLC, 'BB')[.]" (*Id.*). But the signature block, which Mel Cooper signed, reads, "BB Holdings, LLC," which of course is neither BB Holding Group, LLC nor BB LLC. (*Id.* at 424). This document does not support Appellant's version of events. At best, it muddies further the already-murky waters of Mel Cooper's business activities. Far from establishing that BBHG was a shareholder in QT, the Settlement and Release Agreement raises new questions by listing an unknown entity on the signature block, and defining "BB" to include Mel Cooper, BB LLC, and BB Holdings, LLC. It certainly does not allow this Court to conclude that the Bankruptcy Court erred in finding that the BBHG Action was not property of BBHG, and instead constituted part of the Cooper Estate.

The Court briefly notes that Mel Cooper, in the Cooper Action, claimed that he personally owned the QT shares. It was only later, when he filed the BBHG Action, that he asserted that BBHG owned the shares. In the earlier action, Mel Cooper never mentioned BBHG. And in the bankruptcy petition giving rise to the instant appeal, Mel Cooper initially failed to disclose that he held any interest in BBHG. Though these facts are not critical to the Court's decision, they only serve to raise additional doubts as to BBHG's claim to the QT shares. Conversely, this conduct provides additional support for this Court's finding that the Bankruptcy Court did not err in ascribing ownership over the QT shares to Mel Cooper. For all of these reasons, the Court rejects

Appellant's argument that the Bankruptcy Court erred in finding that the disputed property belonged to the Cooper Estate rather than to BBHG.

The Court briefly pauses to address a dispute between the parties over the significance, if any, of statements that the State Court made during a conference in the BBHG Action on June 2, 2016. Appellees assert that the State Court took up the question of ownership over the disputed claims and found that the "claims asserted in the BBHG Action are personal claims of Mel Cooper's and that it is 'up to the Trustee' whether or not he wants to permit Mel Cooper to pursue these causes of action." (Appellees Br. 24 (quoting 6848 App'x 331)). In Appellees' view, that finding could not be disturbed by the Bankruptcy Court because "[i]t has long been established that 'bankruptcy proceedings may not be used to re-litigate issues already resolved in a court of competent jurisdiction.'" (*Id.* at 25-26 (quoting *Glatzer* v. *Enron Corp.*, No. 04 Civ. 4897 (DAB), 2008 WL 4449439, at *5 (S.D.N.Y. Sept. 29, 2008))).

Yet a careful review of the transcript of the June 2 conference reveals that the State Court did not, in fact, make any factual finding as to the ownership over the disputed causes of action. Nowhere does it explicitly find that the QT shares or the attendant causes of action belonged to Mel Cooper, not BBHG. Though the State Court noted that "it is up to the Trustee whether or not he wants to permit Mr. Cooper to pursue these causes of action," and directed Mel Cooper to "go back and ask the Bankruptcy Trustee for permission for Mr. Cooper to assert these claims individually" (6848 App'x 329, 331), the State Court never decided that the causes of action in fact belonged

to Mel Cooper individually.  Instead, it ruminated that, "*[i]f* they are all

individual claims," Mel Cooper's claims would be subject to an automatic stay,

and he should not be able "to get around [an] automatic stay [by] allowing

BB[HG] to assert the claims on his behalf." (*Id.* at 326 (emphasis added)).  It is

clear that the State Court was merely acknowledging that BBHG might not own

the causes of action at issue, and that unless the Cooper Trustee consented to

the BBHG Action proceeding, the question of ownership would need to be

addressed.  Yet it did not make an affirmative finding that Mel Cooper owned

the QT shares.  Accordingly, this Court rejects Appellees' argument that the

Bankruptcy Court lacked authority to disturb the State Court's factual finding,

since no such factual finding was made.

Ultimately, whether the State Court made a factual finding as to the

ownership of the QT shares is immaterial, because the Bankruptcy Court

properly found that Mel Cooper owned the QT shares and that the disputed

causes of action therefore constituted part of the Cooper Estate.

### 3. The Bankruptcy Court Did Not Err in Allowing the BBHG Action to Be Transferred Free and Clear of Attorneys' Charging Liens

Appellant next argues that the Bankruptcy Court erred in permitting the

BBHG Action to be transferred free and clear of attorneys' charging liens.

(Appellant Br. 27).  It notes that, under New York law, a charging lien is

imposed wherever "a verdict, report, determination, decision, award,

settlement, judgment[,] or final order [is issued] in his or her client's favor[.]"

(*Id.* at 28 (quoting N.Y. Jud. Law § 475)).  Appellant further states that an

attorney who is retained pursuant to a contingency agreement is entitled to the fair and reasonable value of her services. (*Id.*). In its view, there is an extant charging lien to compensate BBHG's former attorney, Mitchell Shapiro, for the work performed in the BBHG Action, and the Cooper Trustee was not authorized to transfer the disputed causes of action free and clear of that lien.

The Court easily disposes of Appellant's arguments. Mitchell Shapiro, Mel Cooper's former counsel and the purported beneficiary of the charging lien, signed a stipulation between the Cooper Trustee and BBHG, releasing the Cooper Estate from any obligation to compensate BBHG's current or former counsel. The Stipulation and Consent Order, which was so ordered by the Bankruptcy Court, states:

> Neither the Trustee nor the Debtor's estate ha[s] retained or [is] retaining the Shapiro Firm in connection with the State Court Action or for any other purpose. Neither the Trustee nor the Debtor's estate shall have any obligation, liability[,] or responsibility to fund, pay[,] or reimburse the Shapiro Firm or any other professional that is retained to represent BBHG in the State Court Action or otherwise for any fees or expenses that are incurred in connection with prosecution of the State Court Action or otherwise.

(6848 App'x 464). It further states:

> BBHG, and not the Trustee, has retained the Shapiro Firm to represent it in the State Court, and BBHG and the Shapiro Firm understand that neither the Trustee nor the Debtor's estate shall in any way be responsible or liable for any cost, expense[,] or liability in connection with the State Court Action, including, without limitation, the fees and expenses of the Shapiro Firm in connection with the State Court Action.

(*Id.* at 462-63).

The plain terms of this Stipulation bar BBHG's attorneys from recovering any fees from the Cooper Estate. *See In re E.C. Ernst, Inc.*, 4 B.R. 317, 319 (Bankr. S.D.N.Y. 1980) (explaining that, for an attorneys' lien to be enforceable, "[t]he attorney must not have evidenced any intent to waive the lien"). That is particularly true given that the disputed causes of action constitute part of the Cooper Estate, which did not hire BBHG's attorneys, and against whom BBHG's attorneys agreed not to seek any compensation. BBHG and its attorneys consented, and the Bankruptcy Court ordered, that the Cooper Estate would have no obligation to pay legal fees to BBHG's attorneys in connection with the BBHG Action. The Bankruptcy Court was therefore justified in approving a settlement agreement that transferred the BBHG Action free and clear of any charging liens.

### 4. The Bankruptcy Court Did Not Err in Failing to Apply the Doctrine of Incorporation By Estoppel

Appellant's next line of attack echoes, and builds on, an argument that this Court has already rejected: that BB LLC was the rightful owner of QT shares, and that BB LLC subsequently assigned those shares to BBHG. Appellant now argues that, even if BB LLC had not been incorporated at the time the Shareholder Agreement was executed, the doctrine of incorporation by estoppel bars the Cooper Trustee and the Transferees from asserting that Mel Cooper owns the QT shares and the disputed causes of action. Specifically, Appellant claims that, because Mel Cooper represented in the Shareholder Agreement that he was doing business through BB LLC, the Cooper Trustee and the Transferees are now barred from questioning BB LLC's existence.

Appellant's incorporation by estoppel argument misses the mark. The New York Court of Appeals has explained that the critical question is whether "a defendant seeks to escape liability to a corporation plaintiff by contending that the plaintiff is not a lawful corporate entity[.]" *Boslow Family Ltd. P'ship* v. *Glickenhaus & Co.*, 7 N.Y.3d 664, 668 (2006) (internal quotation marks and citation omitted). The doctrine's purpose is to estop a defendant from claiming that a plaintiff is not a lawful entity "after [the defendant] benefitted from its contract with plaintiff." *Id.*

Here, the entity whose existence is at issue — BB LLC — is not a plaintiff, or even an interested party, in any of the relevant actions before the Bankruptcy Court or the State Court. That alone makes the doctrine inapplicable here. In addition, the Cooper Trustee, who stands in the shoes of Mel Cooper, is not a defendant that has "benefitted from [any] contract with [BB LLC]." *Glickenhaus & Co.*, 7 N.Y.3d at 668. Nor are the Cooper Trustee and the Transferees attacking BB LLC's existence in order to escape liability. Instead, they do so to identify property belonging to Mel Cooper, and in turn to the Cooper Estate. For these reasons, the doctrine of incorporation by estoppel does not apply here.

### 5. The Bankruptcy Court Did Not Err in Denying Appellant's Discovery Requests

Finally, Appellant claims that the Bankruptcy Court failed to provide it with a full and fair opportunity to conduct discovery and establish a record as to whether BBHG owned the disputed causes of action. Appellant asserts that "there is a material dispute between the … claim that the BBHG Action is the

property of the Cooper Estate, and BBHG's position, based upon the documentary evidence and sworn statements of Mel Cooper and [Jerome] Goldman, that the BBHG Action belongs to Appellant." (Appellant Br. 31). Appellant further believes that, to resolve that dispute, it is entitled to "discovery from QT, David Cooper[,] and Eric Ramos, as well as various [unidentified] third-parties[.]" (*Id.*). The discovery "would include depositions of QT, David Cooper[,] and Eric Ramos concerning, among other things, their professed inability to produce documents responsive to Appellant's document demands, and the nature and extent of their awareness of BB LLC's or Mel Cooper's assignment of the QT shares to BBHG." (*Id.*).

In adversary bankruptcy proceedings, such as the instant proceeding, courts generally apply the discovery rules promulgated under the Federal Rules of Civil Procedure 26 through 37. As a court in this District has explained, "Bankruptcy Rule 7026 makes Rule 26 of the Federal Rules of Civil Procedure applicable in adversary proceedings, and Bankruptcy Rule 9014(c) makes Bankruptcy Rule 7026 applicable in contested matters." *In re Quigley Co., Inc.*, 437 B.R. 102, 149 (Bankr. S.D.N.Y. 2010).

This Court agrees with the Bankruptcy Court that, under the Federal Rules of Civil Procedure, Appellant is not entitled to additional discovery. The Court notes at the outset that the parties from whom Appellant seeks additional discovery have already "serv[ed] responses to interrogatories, respon[d]e[d] to document demands, and [ ] produc[ed] over 800 pages of documents[.]" (6849 App'x 524-25). The Court notes too that, if BB LLC

existed, the relevant documents would be publicly available, or at the very least, would be at least as accessible to Mel Cooper and BBHG as to the parties from whom they seek additional discovery.  (6848 App'x 547).

The record also suggests that BBHG's additional discovery requests would be futile.  Indeed, the parties from whom BBHG principally seeks additional discovery — QT, David Cooper, and Eric Ramos — appear to have lost whatever relevant documents they may once have had in their possession.  In a supplemental declaration, dated August 7, 2017, David Cooper explains that, in 2012, QT "was evicted from a Moshe's storage facility in Brooklyn[.]"  (6849 App'x 525).  "In connection with that eviction, [they] lost the contents of the storage unit, including servers, business records, computer equipment, and related QT[ ] business materials."  (*Id.*).  Additional documents were lost "in or about November 2014, when QT[ ] was evicted from its office space that was located at 45 Broadway, New York, NY."  (*Id.*).  And "the only documents for which BBHG claims to be searching relate to the purported formation of BB LLC[ ] — the non-existent entity through which Mel Cooper claims to have owned his shares of QT[ ]."  (*Id.* at 526).  David Cooper further declares that he had "never seen any such documents," and notes that, "had they ever existed … those documents would be a matter of public record and retrievable from the Secretary of State."  (*Id.*).  Finally, he asserts that "there is no testimony that Eric Ramos or I could possibly offer that would have any bearing on whether, prior to taking his shares of QT[ ] in the name of BB

LLC[ ], Mel Cooper ever formed that entity, and if he did, whether that entity subsequently assigned QT[ ] shares to BBHG." (*Id.*).

On this record, the Court cannot find that the Bankruptcy Court erred in denying BBHG's request for additional discovery. Nor does this Court find any support for Appellant's contention that the Bankruptcy Court "failed to provide Appellant with a full and fair opportunity to establish a record[.]" (Appellant Reply 6). When the Court considers (i) the public nature of some of the documents sought, (ii) the parties' relative access to the relevant information, (iii) the likely loss or destruction of QT records that might once have been in the possession of the parties from whom Appellant seeks discovery, and (iv) David Cooper's representation that neither he nor Eric Ramos has information pertinent to the issues at hand, it is persuaded that any further discovery would be futile, if not vexatious. It therefore concurs with the Bankruptcy Court's decision not to grant Appellant's request for further discovery.

## CONCLUSION

For the reasons stated above, Appellant's tandem appeals are DENIED. The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close the two cases listed in the caption above.

SO ORDERED.

Dated:     September 22, 2018
           New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge